In the matter of the probate of a certain writing purporting to be the last will and testament of PHILIP DRIES, deceased.*

[Decided June 30th, 1903.]

1. If a woman, at or before a marriage ceremony, represents herself to be competent to marry, or conceals the fact that she is not so qualified, and thereafter her supposed husband makes a will in her favor, believing her to be his wife, and she knew she had another husband living when she married the testator, such testamentary disposition will be held void if the representation or concealment was fraudulent, and it induced the execution of the will.

2. The facts show no fraudulent representation or concealment.

On appeal from a decree of the Essex county orphans court refusing probate of a will.

*Mr. Abner Kalisch* and *Mr. Samuel Kalisch*, for the appellants.

*Mr. Frederick C. Preisel*, for the respondent.

REED, VICE-ORDINARY.

Philip Dries died leaving a will in which he said in Item two:

"I give, bequeath and devise a house and lot of land known as No. 201 Belmont avenue, in the city of Newark, where I now reside, together with the furniture therein contained, to my beloved wife, Louisa Dries, to be

---

*This opinion was omitted from its proper place.—REP.

used and enjoyed by her during the term of her natural life—that is to
say : so long as she remains single. In case she should marry, and from
and immediately after her death, I give, bequeath and devise to all my
surviving children, their heirs and assigns, forever, both real and per-
sonal, to be divided share and share alike."

This will seems to have been executed on the 20th day of No-
vember, 1899.

This will was denied probate in the orphans court because, in
the opinion of that court, it was executed by Philip Dries in the
belief that Louisa Dries was his legal wife, when, in fact, she
had, at the time of her marriage with him, a living husband,
known to her to be living, and of which fact she failed to inform
the testator.

There can be no doubt that if a woman, at or before a mar-
riage ceremony, represents herself to be competent to marry, or
conceals the fact that she was not so qualified, and thereafter her
supposed husband makes a will in her favor, because he believes
her to be his wife, and it turns out that she had, and knew she
had, another husband living when she married the testator, such
testamentary disposition will be held void.

To avoid a will upon this ground, however, the representation
or concealment should be fraudulent, and it should appear, not
necessarily that they were made to induce the execution of a will,
but that they did induce its execution. In *Wilkinson* v. *Joughin,
L. R. 2 Eq. Cas. 319,* the misrepresentation by or silence of the
supposed wife was willful. In *Kennell* v. *Abbott, 4 Ves. 802,* a
man had, in the language of the master of the rolls, falsely as-
sumed to be the husband of the testatrix; he having a wife living
at the time of his marriage with testatrix, and this alone could
be supposed to be the motive of her bounty.

In the present case, I am inclined to believe that the woman
herself was deceived, and that she thought she was free to marry
Mr. Dries.

It appears that in 1875 she had married a miserable fellow
named Meyers. He abused her, she had him arrested, and before
the magistrate it appears they signed separation papers of some
kind. When they separated does not appear, but the separation
appears to have occurred some time before the year 1888. She

thereafter lived alone up to September, 1888. Her first husband was then living with another woman by whom he had had two children. In September, 1888, she married a Mr. Heiberger, who seems to have died in 1893. On August 1st, 1897, she married Mr. Dries, the testator. She says that in addition to her knowledge that her first husband was living with a woman as his wife, Meyers himself told her that he had a divorce. Meyers denies that he did so tell her, but he is so entirely despicable that his word goes for very little. I incline to the belief that he did tell her that he was divorced. A person with more knowledge of the world would not have relied upon the facts which she details, but would have had the records of the appropriate court searched to ascertain the truth of Meyers' assertion. But she is an ignorant woman, little acquainted with our language and our customs. The fact that Meyers was living with another woman, by whom he was having children, of which she says she was informed, would not be unlikely to lead her to the belief that she was free to marry.

Again, she says she told Mr. Dries before her marriage with him that she had had a husband who was living.

The learned judge who heard the case before did not believe this, because it was unlikely that Mr. Dries would knowingly become a bigamist. This conclusion rests upon the assumption that she told Mr. Dries the bald fact that she had been married to a man named Meyers who was still living.

I think it probable that she not only told Dries that she had been married to a man still living, but that she told him substantially what she has told the court about her relations with him.

After telling of the trouble which the daughters of Mr. Dries made when they learned of his intention to marry her, she says that they (the daughters) told him all kinds of stories about her.

She was asked: "Did they tell him anything about you?" She said: "They said I got another man. That is what they said. He told them I told him all about it, he know it. I told him right away; he says I was foolish to live so long with a man like this, like he is."

Again she was asked on cross-examination: "You say you told him you were a married woman at the time he married you, did you?" She said: "Yes, sir; I did."

"*Q.* Was that before you married him?

"*A.* Before I married him I told him all about it.

"*Q.* (By the Court.) Well, where was it that you told him that, that Meyers had been your husband?

"*A.* He came over to my house on Sunday to see me.

"*Q.* This was before you were married?

"*A.* Yes, sir. Afternoon the youngest one or one that is going on nineteen now, he got her with him on same day. She was over and had been with me, and then after dinner she wanted to go off, and he staid until supper time, and then he go back home."

Again she says:

"I told him I had a man, Mr. Meyers, and he is married, and then I was a widow, and all. He has children, and then I married Heiberger, and I am now over three years a widow from Heiberger, when he died; he says that it is all right.

"*Q.* Did you tell him that Meyers was living?

"*A.* Yes, sir; he knew it; I told him.

"*Q.* You knew it, then, too?

"*A.* I told him on account—I says he has got a wife and children already; he knew all about it."

She does not say that she told Mr. Dries that Meyers had told her that he had a divorce; she does say that she told Mr. Dries "all."

It is not improbable that the "all" included the story of Meyer's visit to her and statement that he was divorced. However that may be, I have no doubt that she talked with Mr. Dries about the existence of Meyers, and that Mr. Dries knew that Meyers had been her former husband, and was still living.

The witness says that Mr. Dries told her that his daughters had told him that she had a husband named Meyers living.

One of the daughters admits that she knew it; she says that she cut a scrap from a newspaper. She denies, however, of telling her father about it. But taking into account the inimical feeling towards this witness, it is in the highest degree improbable that if the daughters had knowledge of such a fact they did not promptly communicate it to their father.

The daughter says that she got her information about three years ago—she was speaking in January, 1902. She was so informed, therefore, ten months before the will was made, and if she communicated her information to her father within that time, testator knew of it, and had probably discussed the matter with his supposed wife before executing his will.

The daughter is not certain of the date when she heard of the existence of Meyers, and it is as likely that she learned of it while her father was proposing to marry as it is that she learned of it afterward.

Mr. Dries was probably little less ignorant than she, and accepted her account as sufficient to entitle her to marry him.

I am constrained to the conclusion that it has not been proved that the will was the product of the woman's fraud and that the will should be admitted to probate.