**PAYTON v. SHIPLEY.**

No. 10471—Opinion Filed Jan. 8, 1921.

Rehearing Denied Feb. 1, 1921.

(Syllabus by the Court.)

1. **Wills—Testamentary Capacity — Opinion Evidence.**

The subscribing witnesses, physicians, and experts may testify as to the mental com-

petency of a testator without stating facts or grounds upon which their opinion is based, but the rule is to the contrary as to nonexpert witnesses. Nonexpert witnesses must state the facts upon which they base an opinion as to the mental competency of the testator, and the probative force of the opinion is to be adjudged by the court or jury according to the credibility of the witnesses and the strength or weakness of the facts upon which it is based.

**2. Same—"Sound Mind."**

A testator has a sound mind for testamentary purposes when he can understand and carry in mind, in a general way, the nature and situation of his property, and his relations to the persons around him, to those who naturally have some claim to his remembrance, and to those in whom and the things in which he has been chiefly interested. He must understand the act which he is doing and the relation in which he stands to the objects of his bounty and to those who ought to be in his mind on the occasion of making his will.

**3. Same — Judgment — Sufficiency of Evidence.**

We have examined the record in this case, and find that the testator did not possess testamentary competency to make a will, and that the judgment of the trial court is against the clear weight of the evidence.

Harrison, Kane, Pitchford, and Bailey, JJ., dissenting.

Error from District Court, Pontotoc County; J. W. Bolen, Judge.

Proceedings for probate of will of Philip Payton; Nancy Bell Shipley, proponent, and Noah Payton, contestant. Judgment admitting will to probate, and contestant brings error. Reversed and remanded.

W. T. Anglin, C. E. Hall, and J. T. Young, for plaintiff in error.

H. F. Mathis, J. M. King, and Jno. P. Crawford, for defendant in error.

HIGGINS, J. Philip Payton was a full-blood Choctaw Indian, a mute, and at the time of his death was under guardianship on the grounds of incompetency. He was the owner of an allotment of land, consisting of 320 acres, and money in the bank in the sum of $1,743.66, which was the proceeds of a sale of inherited lands by him under guardianship proceedings as an incompetent.

On the 7th day of March, 1914, Payton devised and bequeathed practically his entire estate to Nancy Bell Shipley, the wife of his guardian. He departed this life on the 16th day of December, 1917. His last will and testament was presented to the county court of Pontotoc county for probate. That court refused to probate the same, but upon appeal to the district court the will was there probated, whereupon a suit was instituted in this court to review the judgment and proceedings of the district court.

There are several assignments of error, but the particular assignment relied upon is whether or not Philip Payton possessed testamentary capacity at the time the will was executed.

Upon an examination of the entire record in this case we find the history of Philip Payton and matters pertaining to his competency to be substantially as follows: That he was, as heretofore stated, a full-blood Indian, a mute; that he possessed only very crude methods of indicating his ideas; that he knew no deaf and dumb alphabet, and never had attended a deaf and dumb school; that he was about 41 years of age at the time of his death; that in 1898 an Indian kinsman opened up a lease for him on Indian lands, and entered into an agreement with one M. A. Sells, the father of the beneficiary under the will, that if he, Sells, would look after and care for Philip he could have the use and benefit of this lease of Philip's; that Philip lived with Mr. Sells until about 1904; that the lease then was turned over to the daughter, the beneficiary, who also took Philip along with the lease, and he continued to live with her and her husband until the time of his death with the exception of about one year.

We further find that in 1905, M. E. Shipley, the husband of the beneficiary, made application to the clerk of the United States court at Ada, Indian Territory, to be appointed guardian of the person and estate of Philip for the reason that he was an incompetent, and was so appointed, but that at a later date this appointment appears to have been set aside, the court finding the guardian not a proper person to be guardian. We further find that at a later date application was made to the United States court at Durant, Indian Territory, by one Sprowls to be appointed curator of his estate on the grounds of the incompetency of Philip, and he was so appointed. The record does not show what became of this appointment. We further find that at a later date, subsequent to statehood, a representative of the Interior Department of the federal government investigated Philip's condition, and as a result made application to the county court at Ada for the appointment of M. E. Shipley as guardian of the person and estate of Philip on the grounds that Philip was an incompetent, and he was so appointed by the court. We further find from the record that Payton executed deeds to certain inherited lands situated in Bryan county; that, as guardian, M. E. Shipley, husband of the beneficiary, employed counsel and instituted proceedings in the district court of that county to set

aside the deed executed by Philip and obtained from the court in June, 1913, a finding and judgment that "Philip was wholly devoid of understanding, and wholly incapacitated from understanding the nature of business transactions of any kind," and for that reason canceling the deed executed by him to his inherited land. We find that in the guardianship report filed by M. E. Shipley in the county court, in an application for allowance for the care and keep of Philip, the guardian states: "That said ward is not physically strong, and this fact, together with the mental imbecility of said ward, renders him practically incapable of doing any work of any value to said guardian." We further find that in March following the decree of the district court setting aside the deed executed by Philip as above stated, and while Philip was seriously ill with pneumonia at the home of the guardian and beneficiary, the guardian sought the services of an attorney to prepare a will and gave to him the data to be written therein, wherein Philip was to devise and bequeath practically all of his estate to the wife of the guardian. The attorney did not at that time prepare the will, but at a later date one Yeargen procured the same attorney to draft such a will, which is alleged to have been signed by the testator and which is sought to be probated in this case.

From the record we find that about the same number of witnesses testified on each side. The witnesses swearing most friendly to the proponent, the beneficiary, were her kindred, to wit, her father, son, son-in-law, and cousins. When the evidence of the kindred is eliminated there is very little left. On the other hand, the witnesses testifying on behalf of the contestant were not related to any of the parties to the suit or in the result of the action. The only evidence that the testator ever knew the contents of the will is the evidence of the beneficiary and her son-in-law, Mr. Turknett, a subscribing witness to the will. The other subscribing witness died subsequent to the execution thereof and prior to the time the matter of probating the same was heard. He, however, was a kinsman of the beneficiary. Mr. Yeargen was present and stated he was to receive $2.50 for procuring the services of an attorney in drafting the will, but he states that he did not understand the communications between one of the subscribing witnesses, who claimed to know how to communicate with Philip through signs, and Philip, but that as far as he could see and know Philip appeared to understand the will.

The subscribing witnesses, physicians, and experts may testify as to the mental competency of the testator without stating facts or grounds upon which their opinion is based, but the rule is contrary as to nonexpert witnesses. The nonexpert witnesses must state the facts upon which they base an opinion as to the mental competency of the testator, and the probative force of the opinion is to be adjudged by the court or jury according to the credibility of the witnesses and the strength or weakness of the facts upon which it is based. 40 Cyc. 1035-1041. The only expert witness testifying in this case was the physician who attended the testator during his last illness, who stated that he had a childlike mind, a mind that never developed after he was five or six years old; that he took his medicine like a child.

We find from the record that the nonexpert witnesses testifying for the proponent based their opinion as to testator's mental capacity to make a will upon the fact, and laying as a ground for their opinion, that he could plow, hoe, feed and water stock, that he knew he had land and money in the bank; and on the evidence of one witness who testified that Philip could count from 1 to 30; in the testimony of another witness it is not clear whether or not this witness could count to Philip as high as 300 or whether Philip himself could count that much; and it is further stated that Philip could weigh a sack of cotton after he had picked the same. Aside from the credibility of the witnesses testifying to mental competency, the facts they testified to indicating mental competency should be given more weight than their mere opinion in the matter as to his competency, and this is so stated by Cyc. above. So the question presents itself, even upon the evidence of the witnesses showing positive acts of the testator's competency, whether or not these acts within themselves would be sufficient to prove testamentary competency. The furthermost bounds of his mental competency appear to have merely been the performance of small duties upon a farm, to wit: to hoe, plow, feed and water stock, pick cotton, weigh a sack of same, and to count as high as certain numbers.

This record is long, and we shall not attempt to give the same other than the evidence of the beneficiary in the will and her son-in-law, the subscribing witnesses, they being the ones testifying, in our judgment, most friendly in support of the probate of the will, and the testimony of W. B. Toney and C. C. Hatchett, the attorneys who represented testator's guardian in the suit above referred to to set aside certain deeds. These attorneys have no interest in this action.

Mrs. Nancy Bell Shipley, proponent and beneficiary under the will, testified as follows:

"I have known Philip Payton for about

13 or 14 years, during which time he has lived in my home and has been treated as a member of the family; I furnished him a bed and he ate at the table with the rest of the family; I was good to him, as to one of the children; he was good to me; I could communicate with him in his deaf and dumb language and could make him understand anything that I ever tried to tell him; he seemed to have good sense, to be deaf and dumb, and knew he owned land; in his various conversations, he said that when he died he wanted me to have his land and money, and that when I died, if he lived, he would get what I had; he knew he had money in the bank; he could plow, cut wood, and hoe and do everything that could be done about the place just like one of the children did; he was about 40 years old at the time of his death; he knew he had a farm, but I don't suppose he knew how many acres he had; don't know whether he knew what it was worth; I don't guess he knew to the dollar how much money he had; I never tried to explain to him how much money or how much land he had."

She was asked this question:

"Q. Was he paid for the work, or did he work like one of the children? A. Worked like one of the children, and we clothed and boarded him. I charged $40 for taking care of him when he was sick with penumonia; he could not read or write and had never attended deaf and dumb school; talked entirely by signs."

Richard Turknett, a subscribing witness and son-in-law of the beneficiary, testified that he knew the testator and had known him for several years and could communicate with him by signs; that he explained to him what was in the will and to whom his property was going, and that he "showed to us" that he wanted Mrs. Shipley to have his land and also his money; that Philip knew he had land and money; that the other subscribing witness, Mr. Butler, was dead; that Mrs. Shipley was good to Philip as a mother could be to a son; that Payton could speak some words, but could not speak a sentence—

"I explained he was giving all his land to Mrs. Shipley; I never talked to him about the number of acres and did not undertake it; I could not take a part of his land and show him what I wanted to do with it; could not show him about fractions of land; I did not show him about his land situated in Choctaw county; I did not know he had any land in Choctaw county at the time of the will; Philip was sick at the time the will was executed; he showed me to sign it."

These questions were asked:

"Q. Now, there was no way to explain to him how much he owned—how many acres he owned—was there? A. No, sir. I never attempted to tell him how many thousand dollars he had in the bank. There was no way and I never tried to tell him the difference between $100 and $1,000 or $15,000; Philip made Mr. Shipley a tolerable fair hand; Philip was smarter than a whole lot of full-blood Indians who could not speak English."

W. B. Toney testified as follows:

"I first knew Philip about 1911 and represented him in some lawsuits for Mr. Shipley, his guardian; conducted two in Bryan county in connection with Mr. Hatchett; had an opportunity to observe his mental condition; he was a full-blood Indian and was deaf and dumb, and had the simple mind of a child, full-blood Indian child; he did not appear to me as having a mind sufficiently developed to be able to comprehend the nature, extent, or value of property; he could probably know he had lands, or might know he had money, but to know and think of lands in acreage—so many acres of land, and those acres of land worth so many dollars—I don't think he ever thought in those kind of terms; I don't think he was capable of knowing a will from a deed, or a deed from a lease, or a lease from a bill of sale, or nature of an estate he would be conveying in those kind of instruments, an heir of descent and distribution or heirship, or whom it would be cast. That is my impression; I never could communicate with him; we were together two trips, four or five days at a time, and I never could communicate with him, and I could not tell anything about his conception, if he had any conception, of this estate or of his kinfolks or anything of the kind; my interest in him ceased when my suits for him terminated in Bryan county; I have no interest in the present matter; my chance to win the lawsuit was to show that he could not make a deed; we believed it and I believe it yet; fought the case out on that line, and saw him off and on up until just before he died, and I think he never got any better."

C. C. Hatchett testified as follows:

"I live at Durant; am a lawyer. I have known Philip Payton since 1903. He was living near Blue, Indian Territory, when I first knew him; knew Philip well until 1908 or 1909, when he moved to near Allen; since then I have known him only on two or three occasions, when he attended court in charge of his guardian, as plaintiff in certain cases in which our firm were his attorneys. We concluded the last litigation for him in January, 1914; probably last time I saw Philip was in December, 1913; I was acquainted with his mental and physical condition at least for ten or twelve years. His physical condition was apparently good; not very strong, but looked as well as the ordinary full-blood Indian. He was full-blood Choctaw. He was deaf and dumb from time I first knew him; could not read or write any language. He knew no system of mute language. When I was around him I noticed that those intimately acquainted with him

had a crude method of communicating with him, but it was only a method by which the simplest means of knowledge could be communicated. He could be told to come to dinner, to use his hoe in chopping cotton by movement of the hand as if hoeing, and he could perhaps be told to go to bed by movement indicating removing his clothes, but outside of matters of that kind he had no way of being communicated with. He was an idiot, wholly devoid of understanding. He did not have sufficient mental comprehension of what a will meant or what land meant or what property meant. He did not have sufficient mental capacity to realize that he owned property. He had a faint comprehension of what silver coins were, but he had no idea whatever as to the meaning of paper money; he knew a nickel or dime would buy candy, but he had no idea the value of money. He did not realize what heirship meant or who were his heirs. I am sure his mind was never developed from that of a very young child. He was without understanding when I first saw him and as I observed him during the course of ten or twelve years. I could never see any improvement, and this was his mental condition the last time I saw him in 1913. I am sure he had no comprehension of what a will meant, nor that by signing a will he would convey property to any one else. I made a test in 1913 to make certain of his mental condition. Mr. Shipley and he came to Durant to attend court. We had two or three suits to set aside conveyances which had been pretended to be made by Philip. The sole ground for setting aside these conveyances was total lack of understanding upon his part. M. E. Shipley was his guardian at the time, and came along with Philip. We got Philip in the office and I endeavored by all the means in my power to attempt to communicate with him by signs and otherwise and ascertain if he knew anything about what a deed was. I was wholly unable to communicate with Philip. His guardian also endeavored to communicate with him and was unable so far as I could see to make him comprehend anything about the meaning of a deed or any other instrument of writing. His guardian was able to communicate with him as to some simple matters like eating and simple things. Outside of that neither the guardian nor myself were able to make him understand anything about a deed, the land, or the meaning of either."

There is no evidence in the record that between the times that Philip was declared an incompetent and the execution of the will by him there had been any change of any kind in his mental competency, but all the witnesses that testified as to whether or not there had been any change stated that there had been no change as far as they could ever see.

Most of the witnesses testifying in behalf of the proponent of the will had known Philip from 12 to 20 years, and from 12 to 15 of these years he had resided with the guardian and the beneficiary under the will and had worked for them, and it appears from the beneficiary's evidence that he was not paid for his services, but worked like one of the children. This would cover that period of Payton's life approximately between 25 and 40 years. When called upon to meet the evidence in behalf of the contestant showing incompetency of Philip, the best that the proponents of the will could offer was that Philip could do certain simple chores of farm work. There is no evidence in this record that he ever in all his life carried on a business transaction of the simplest kind, or that any property of any kind was ever intrusted to him, or that any sum of money in excess of $1 was ever left to his judgment to spend, or that he was ever called to exercise judgment in any manner whatsoever, or that he ever as much as bought his clothes or provided for his own needs.

The next question for consideration is as to what mental capacity is required in order for one to make a valid and subsisting will. Gardner on Wills, p. 100, par. 31:

"A testator has a sound mind for testamentary purposes only when he can understand and carry in mind, in a general way, the nature and situation of his property, and his relations to the persons around him, to those who naturally have some claim to his remembrance, and to those in whom, and the things in which, he has been chiefly interested. He must understand the act which he is doing, and the relation in which he stands to the objects of his bounty and to those who ought to be in his mind on the occasion of making his will."

This court, in Bilby et al. v. Stewart, 55 Okla. 767, 153 Pac. 1173, said:

"Testamentary capacity, or the lack thereof, is a question of fact. There is no rule by which it may be determined, with precision, where capacity ends and incapacity begins, but this question should be determined from all the facts and circumstances of each particular case; and, where the evidence fairly and reasonably supports the findings of testamentary incapacity, the same will not be disturbed."

In this case the witnesses testifying most friendly for the beneficiary and proponent of the will, being the beneficiary and her son-in-law, say that they never tried to explain to him how much land or money he had, and there was no way to explain to him how much he owned. The record in this case shows that Philip owned a tract of land situated in Choctaw county, Oklahoma, of which apparently his guardian and the subscribing witnesses who explained the contents of the will and Philip knew nothing, this being a part of his allotment.

Upon an application of the law to the evidence as above stated, we find that the testator did not possess testamentary competency to make a will, and that the judgment of the trial court is against the clear weight of the evidence.

It is urged that the acts of Mrs. Shipley in caring for Philip were purely humanitarian. We find from the record that out of Philip's estate due allowances were made for his care and keep, and an extra amount during illness. The record indicates that they took good care of him and were kind to him. His guardian voluntarily took upon himself the guardianship of his person and estate, and in being good and kind to him only did that which he agreed to do and the law required and for which he was compensated in money out of his ward's estate

This cause is reversed and remanded, with directions to the trial court to enter a judgment refusing the will probate.

RAINEY, C. J., and JOHNSON, McNEILL, and COLLIER, JJ., concur; HARRISON, KANE, PITCHFORD, and BAILEY, JJ., dissent.

BAILEY, J. (dissenting). I am unable to agree with the majority opinion.

On the 16th day of March, 1917, Philip Payton, a full-blood Choctaw Indian, died in Pontotoc county, state of Oklahoma. The said Philip Payton left no children, wife, father, nor mother, nor grandfather or grandmother, surviving him, and but one uncle, to wit, Noah Payton, the contestant herein, who states that he is the only heir at law of the said Philip Payton, deceased. On the 31st day of March, 1917, there was filed in the county court of Pontotoc county, Oklahoma an instrument in writing, purporting to be the last will and testament of the said Philip Payton, deceased, together with a petition for the probate of said will, and the appointment of Nancy Bell Shipley, the principal beneficiary under the will, as executrix.

After the usual provisions relative to the health and mental capacity of the testator, and the direction for the payment of the just debts of said testator, it is provided:

"I further give and bequeath to each and every person who may be able to show that they are my legal heirs at the time of my death, under the laws of the state of Oklahoma, at the time of my death, if any there be, the sum of five ($5.00) each.

"I further give and bequeath all the rest, remainder and residue of my property, both personal property and real estate to my beloved friend (who has cared for me so faithfully for so many years), Mrs. Nancy Bell Shipley, to have and to hold said prop-

erty to herself, for her heirs and assigns forever.

"I hereby appoint her, the said Nancy Bell Shipley, my sole executrix without bond of this my last will and testament."

The will appears to be properly signed, subscribed, and attested, and is dated the 7th day of March, 1914. Thereafter Noah Payton, plaintiff in error and the alleged sole heir of the said deceased, filed in the county court of Pontotoc county his objections to the probate of said will, which said objections may be summarized as follows:

First, that said will was not executed or attested in accordance with the requirement of law governing the execution and attestation of wills.

Second, that at the time of the execution of the said purported will, the said deceased was of unsound mind, having at the time a guardian duly appointed by the probate court of Pontotoc county; that said testator was not possessed of sufficient testamentary capacity to make a valid will; and,

Third, that said will, if executed at all, was executed because of undue influence, coercion, duress, and fraud practiced on the said Philip Payton by M. E. Shipley, the husband of legatee; and,

Fourth, that the said Philip Payton was a full-blood Indian of the Choctaw tribe, could not read or write, and was deaf and dumb, devoid of understanding and wholly incapable of making a valid disposition of his property at the time of the execution of the purported will.

From a judgment of the county court of Pontotoc county, that court refusing the probate of the will, the cause was appealed to the district court of Pontotoc county, and after hearing in that court the court made and filed its finding of facts and conclusions of law, which may be summarized as follows: (1) that there was no fraud, coercion, duress, or undue influence exerted upon testator in the execution of the will; (2) that the incompetency which had been theretofore adjudicated and found to exist, had ceased; (3) that testator had sufficient mental intelligence to understand the nature of the will and was possessed of testamentary capacity; (4) that the attesting witnesses understood the sign language of the testator and could and did converse with him, and that the will, as actually written, subscribed, and attested, represented the wish and will of the testator, and that the will was the last will and testament of said testator, and duly and properly executed and attested.

It is admitted under the facts as presented by the record that the testator was

a full-blood Choctaw Indian about 38 years of age, deaf and dumb, and unable to read or write either the Choctaw, English, or any other language; that he was unfamiliar with the deaf and dumb alphabet and that his means and methods of communication were limited to such crude signs as he had learned. It is further undisputed that the said Philip Payton was a man of normal physical and bodily strength; that he was able to perform and did perform the usual and ordinary duties about the farm, and that testator had lived in the home of the beneficiary, Mrs. Shipley, and her husband for a period of 15 years, and that during that time he had been treated as a member of the family; that none of testator's relatives, if any there were, had shown any concern or care for his welfare or comfort and that none of such relatives had communicated or visited with him for a long period of time; that the husband of the principal beneficiary was the guardian of the testator; that the simple wants of the testator had been met and provided by Mrs. Shipley. Relative to the mental attitude of the decedent, the evidence presented by the record is at total variance and irreconcilable; some of the witnesses testifying that testator was wholly devoid of mental capacity and unable to appreciate and comprehend the most commonplace things and facts, and was without any conception of property values; while, upon the other hand, it is testified by numerous witnesses that he was possessed of an average degree of intelligence found among full-blood Indians, and that he understood and knew that certain money and funds belonging to him were deposited in a certain bank; that he performed the ordinary duties on the farm with ordinary ability and skill, sometimes engaging himself to neighbors to assist in farm work; that he was able to appreciate the difference in value of certain coins; that he could count on his hands to a number testified to from 20 to 300; that he could weigh cotton; that he knew and recognized those with whom he had opportunity for acquaintance, and it was further testified that those who were continuously associated with him were able reasonably and readily to communicate with him concerning the ordinary affairs and to understand the thoughts and ideas desired to be communicated by him; yet, again, it is testified that he was able to communicate concerning only such matters and objects as were most general and commonplace. There is a suggestion in the record, though not clear, that perhaps the affliction as to speech and hearing did not befall the testator until he had reached the age of 7 or 8 years.

It is first contended that the trial court

erred in finding, as a conclusion of fact and of law, that the will was not obtained by duress, coercion, undue influence, or fraud. Whatever may be the presumption by reason of the fact that Mrs. Shipley, the principal beneficiary under the will, was the wife of the guardian of the testator, we cannot conceive that such fact could do more than to require that it be affirmatively shown that the will was a free and voluntary act of the testator. The rule announced by this court is: The burden of proof in the trial of a contest on the probate of a will, is upon the proponents of the will to make a prima facie showing that the will is entitled to probate; the burden then shifts to the contestant to establish the issues presented by the contest. In re Son-se-gra's Will, 78 Okla. 213, 189 Pac. 865. And while we are presented with no ruling of the court which suggests the placing of the burden of proof to establish the presence of undue influence, coercion, or fraud, but accepting the contention that this burden under the circumstances presented by the record in this case was upon the proponent, we think such burden fairly and fully met. This court, in Re Cook's Estate, 71 Oklahoma, 175 Pac. 507, held:

"Undue influence, such as will invalidate a will, must be something which distroys the free agency of the testator at the time when the instrument is made and which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution."

It is further said:

"It is true from the nature of the subject that proof of undue influence is necessarily largely or wholly circumstantial, and the contestant is not confined to the facts which he may be able to adduce, but is entitled to all the natural inferences which may be derived from established facts. But the will of a person found to be possessed of sound mind and memory ought not to be set aside on evidence tending to show only a possibility of undue influence."

We find nothing in the record in this case that indicates that either the beneficiary or her husband ever at any time made any suggestions concerning the will or any provision thereof, but it is testified that, upon the contrary, the information upon which the provisions of the will were predicated was secured by a disinterested notary, with the aid and assistance of the witnesses to the will, who, the record shows, had long been associated with the testator and were able to readily communicate with him. It is in

evidence that the husband of the principal beneficiary had, about the time, of the making of the will, consulted a lawyer with reference to making such will and stated that it was the desire of the testator to bequeath his property to the beneficiary named. But the notary who prepared the will testified that he obtained from the testator himself, with the assistance above mentioned, the facts and provisions actually inserted in the will.

It should not be forgotten that the defendant in error had for many years stood in the place of mother to the unfortunate testator. and it would be unnatural to suggest that the legitimate influence which arises from the feeling of affection and gratitude created by kindly services should prevent the reward of those who had rendered such services so long, and there is no reasonable evidence to suggest that such feeling of gratitude was taken advantage of to control the mind of the testator, and I am unable to say that the trial court was not justified under the record in holding that such will was not obtained by duress, undue influence, or fraud, but was the free and voluntary expression of the testator.

It is next contended that the court erred in finding, as a matter of fact and of law, that the testator possessed sufficient testamentary capacity to execute the will. It may be noted that, according to the text-writers, the early rule was that those persons born deaf, dumb, and blind, since they always lack the common inlets of understanding, were incapable of having animus testandi. and could not make a valid will. Under the modern rule, however, neither blindness nor deafness and dumbness, nor all of such infirmities, will alone incapacitate a person to perform the testamentary acts. Alexander on Wills, vol. 1, pars. 348, 349. If a person so afflicted has testamentary capacity and can communicate his desires and purposes, whether such desires or purposes be expressed by words, written or spoken, or by signs, and present an intelligible scheme of disposition, the requirements of the statutes have been met. Alexander on Wills, vol. 1, pars. 348, 349; Potts v. House, 6 Ga. 324, 50 Am. Dec. 329; Christmas v. Mitchell, 38 N. C. 325; Goods of Geale, 35 W. & Tr. 431; Stancell v. Kenan, 33 Ga. 56.

It will have been observed that at the time of the execution of the will, the testator was under guardianship and had been adjudged incompetent to manage his property. There had been no judicial determination of a restoration to competency; but it is provided by section 890, Rev. Laws 1910, that:

"After his incapacity has been judicially determined a person of unsound mind can make no conveyance or other contract, nor designate any power, nor waive any right, until his restoration to capacity is judicially determined. But if actually restored to capacity, he may make a will, though his restoration is not thus determined."

And in the case of Hill et al. v. Davis et al., 64 Oklahoma, 167 Pac. 465, it is said:

"Upon the issues of testamentary capacity, it appears that the testatrix had, prior to the time of the execution of the will, been adjudged incompetent to manage her property, and a guardian of her estate appointed. Her restoration to capacity had not been judicially determined, and the guardianship in fact continued to her death. But she could, nevertheless, make a valid will, if she had been in fact actually restored to capacity at the time of its execution."

The trial court in its findings recognized the rule that the findings of the probate court that on the date he was adjudged an incompetent he was an incompetent, and in order for testator to have capacity to make the will, it was necessary to find that such incompetency had ceased. But the court found further:

"That the same mental condition did not exist at the time of the execution of the will as at the time of the adjudication of the incompetency, and that testator possessed testamentary capacity and was mentally competent to make the will."

This court has had frequent occasion to determine what state of facts amounted to testamentary capacity, and the ordinary test of testamentary capacity is: "Did the testator understand the effect and consequence of his act at the time the will was executed?" A test often quoted is stated in Gardner on Wills, p. 100, par. 81, viz.:

"A testator has a sound mind for testamentary purposes only when he can understand and carry in mind, in a general way, the nature and situation of his property, and his relations to the persons around him, to those who naturally have some claim to his remembrance, and to those in whom, and the things in which, he has been chiefly interested. He must understand the act which he is doing, and the relation in which he stands to the objects of his bounty and to those who ought to be in his mind on the occasion of making his will."

This court, in Bilby et al. v. Stewart, 55 Okla. 767, 153 Pac. 1173, said:

"Testamentary capacity, or the lack thereof, is a question of fact. There is no rule by which it may be determined, with precision, where capacity ends and incapacity begins but this question should be determined from all the facts and circumstances of each particular case; and, where the evi-

dence fairly and reasonably supports the findings of testamentary incapacity, the same will not be disturbed." 40 Cyc. 1331; Gordon et al. v. Gordon, 92 Kan. 730, 142 Pac. 242; Slaufgter v. Heath et al., 127 Ga. 747, 57 S. E. 69, 27 L. R. A. (N. S.) 1.

The conflicting testimony, as has been heretofore noticed, concerning the testamentary capacity of the testator presented a question of fact for the determination of the court and the testamentary capacity having been determined upon evidence reasonably supporting the same, under the authority of numerous decisions of this court such finding will not be disturbed here. Bilby et al. v. Stewart, supra; Gordon et al. v. Gordon, supra.

The last assignment of error is that the court erred in finding as a fact and in his conclusions of law and in his judgment entered in this cause that two of the attesting witnesses understood the sign language of the deceased and could and did converse with him, and that said will was properly published by the testator by his declaring to the attesting witnesses said instrument to be his last will and testament.

To my mind, the most difficult phase of this case is presented in this assignment, and while the difficulties standing in the way of the conclusion reached by the trial court are not overlooked, under the findings of the trial court and the condition of the record presented to us. The difficulty lying in the pathway of the contestant is still greater. It should be noted that a number of times during the hearing of this cause witnesses were asked to indicate the sign and motion used in describing objects and matters to the testator, and signs and motions used by the testator in indicating his replies and purposes. These motions and signs in many instances are not detailed in the record, but the record discloses that "witness here indicates." The effect, clearness, force, and meaning of these motions and signs were available to the trial judge, but unavailable to this court, but it is in evidence that the witnesses to the will and the members of the family with whom testator lived, after continued association, were easily and readily able to understand the meaning of testator's signs and motions. I am not unmindful of the difficulty of the accurate interpretation of the signs and motions that might be made by one afflicted as was the testator, but I think much of the difficulty that may be immagined under such circumstances disappeared when the simple terms of the will now presented are considered.

In determining testamentary capacity and the ability to express one's purpose, the nature and character of the will must be considered. A will may be simple or complex, and the issue is not whether the testator had capacity to make any certain kind of will but whether he had capacity enough to make the particular will in dispute. The number of objects and character of the disposition may easily affect the mental efforts and ability required and, as was said in Campbell v. Campbell (Ill.) 22 N. E. 620:

"The capacity to comprehend a few simple details may in one case, suffice to enable the party to intelligently dispose of his property by contract or will, while in another case, if the estate be large, requiring the remembrance of many facts, and the comprehension of many details, and the disposition to be made is complicated, the same mental capacity may be wholly insufficient to that intelligent understanding of the business requisite to the making of a valid will."

The provision virtually amounted to bequeathing testator's entire estate to Mrs. Shipley. It is true that, under the admitted testimony of the witnesses, it is doubtful whether the testator indicated that he desired to make a bequest of $5 to all next of kin who might establish their heirship, and it is perhaps certain, under the record in this case, that testator did not understand that he was directing the appointment of Nancy Bell Shipley as executrix of the will and testament; but, admitting these facts to be true, I do not understand that the will is to be held invalid for such reasons, for it has been frequently held that where the invalid portions of a will can be separated from those which are valid and still give effect to the general testamentary scheme, the invalid clauses will be disregarded, and those which are valid upheld. Alexander on Wills, par. 38; Carpenter v. Hubbard (Ill.) 105 N. E. 688; Johnson v. Preston, 226 Ill. 447, 80 N. E. 1001, 170 L. R. A. (N. S.) 564; 40 Cyc. 1080.

Regarding the effect of previous judgments setting aside conveyances by reason of testator's incapacity, see Collins v. Long (Ore.) 186 Pac. 1038.

Without discussing the comparative intelligence required to support a finding of testamentary capacity as measured by the capacity to make legal and binding contracts, it is pertinent to note the requirements of the statute relative to the necessary ability to support valid and binding contracts. Section 877, Rev. Laws 1910, provides:

"All persons are capable of contracting, * * * except persons of unsound mind"

—while section 882, Rev. Laws 1910, provides:

"Persons of unsound mind within the meaning of this chapter are idiots, lunatics and inbeciles."

Without defining the terms used in the statute, I do not believe that testator could have been fairly held to come within either of the classes designated. It must not be forgotten that testamentary capacity must be tested as of the time the will was executed. A number of witnesses, apparently well advised and wholly disinterested, measured the testator as having been possessed of the "intelligence possessed by the average full-blood Indian."

To overturn the findings of the trial court is, in my opinion, to disregard the many decisions of this court relative to the weight and effect to be given to the findings and conclusions of the trial court.

The legacy to the beneficiary in the will, under the circumstances of the record, was most natural. Tender ministrations in sickness and watchful care in health justified a full feeling of friendship and affection. The bequest was a simple one, easily expressed, and, in spite of the conflicting evidence as to the mental attitude and testamentary capacity of the testator, I have no difficulty in concluding that the findings of the trial court were not against the clear weight of the evidence.

For the reasons assigned, the judgment of the trial court, in my judgment, should be affirmed.

HARRISON, V. C. J., and KANE and PITCHFORD, JJ., concur in this dissent.