## In re LINCOLN'S ESTATE.
## LINCOLN v. LINCOLN et al.

No. 28518.  Sept. 12, 1939.

Rehearing Denied Oct. 3, 1939.

B. F. Davis, J. A. Patterson, and Earl A. Davis, for plaintiff in error.

Anglin & Stevenson, O. S. Huser, Con Long, and James W. Pipkin, for defendants in error.

DANNER, J. Houston Lincoln contested probate of the will of his deceased father, Peter Lincoln. The proponents of the will demurred to the contestant's evidence and the trial court sustained the demurrer. The contestant appeals, contending that his evidence showed that the will was obtained by undue influence and fraud of Sarah Lincoln, testator's widow, and also that it showed lack of testamentary capacity.

Upon the part of proponents, O. H. Presson testified that he had represented testator as attorney for approximately three years prior to the execution of the will; that dur-

ing that time he had conferred with testator, in testator's home and at the attorney's office, two or three times a week; that in the early part of 1935 he drew a will for testator and that subsequent thereto and in June of 1935, testator married Sarah Lincoln, formerly Bashears; that after said marriage testator came to his office and told him that he wanted to make a new will in order to give Sarah her part of the estate; that witness drew said new will; which had practically the same terms and conditions as were contained in the former will, in so far as contestant is concerned. Witness testified that subsequent to that time, one of the beneficiaries in that will got killed, and again testator came to him and asked him to draw a new will, substituting another for the beneficiary who had been killed; that the will now in question was then prepared, leaving Sarah Lincoln one-third of the estate, which is the same share as she would have received under the former will. The witness testified that he prepared the will and went to testator's home, accompanied by Jayne Cunningham and H. Mason, where the will was read to the testator, at testator's request, after which testator stated that such was the way he had told witness to write the will. The witness testified that the testator was of approximately 90 years of age and had failing eyesight and bad health, but that he was in the possession of his mental faculties at all times except when he was sick in bed with a high fever, and, in substance, that he understood what he was doing at all times when witness dealt with him. Several witnesses, including the two witnesses to the will, both of whom had known testator for many years and one of whom had had business dealings with him, also testified that on the occasion of the execution of the will Peter Lincoln was of sound mind and that he understood what he was doing.

The evidence of the contestant did not refute any of the foregoing. It was restricted exclusively to showing that the proponent Sarah Lincoln, a woman of about 54 years of age, first entered testator's household as a housekeeper or nurse, and then deliberately brought about a marriage between herself and the testator for the sole purpose of obtaining a share of his property. For the double purpose of clarifying the facts and in order that it may be certain that we have not overlooked any of the evidence submitted by the contestant, we shall assume, without deciding, that the following excerpt from his brief is true

and correct, with two exceptions, however, which we shall point out later:

"The first important thing which was done was to procure a loan from the testator, with the full knowledge and approval of Uncle Peter's attorney and private adviser, and this loan was never collected and no attempt was made to collect it. Apparently, at this stage of the game Sarah decided it would be well to marry Uncle Peter and thus acquire a larger interest in his estate by getting him to execute a will. Her co-conspirator in this move was the witness, J. A. Evans. By their joint efforts they managed to borrow from Peter Lincoln the sum of fourteen hundred dollars ($1,400) on the pretext of using the money in a well drilling enterprise at Muskogee. Out of this transaction Sarah received an interest in a lease and the sum of two hundred dollars ($200), which, *** she needed in order to marry Peter Lincoln. We have now the case of the victim furnishing the funds to the conspirators necessary for them to carry out their selfish designs.

"Sarah had spent considerable time in the home of Peter Lincoln, constantly attending him as his nurse and housekeeper, before the question of marriage was broached. One day she called Jim Freeman, a colored minister, to the house and after he had talked for some time with Uncle Peter, Sarah called him to the back door and told him that he had been called to perform a marriage ceremony for her and Uncle Peter and gave him a marriage license and suggested that he return the next day. The minister kept his appointment and on his return to the home of the testator Sarah told him in a low voice, 'We are ready.' Uncle Peter said nothing and the minister said 'Uncle Peter, I am at your service,' and Uncle Peter replied, 'At my service for what?' 'To marry you,' answered the minister, and the prospective groom then said, 'My God, who told you I wanted to marry. I haven't told you nothing about I want to marry. Give me my ten dollars and get out of my house.' When Uncle Peter failed to go through with the ceremony Sarah slipped out to another room and put on her uniform and tried to make it appear that nothing had happened. After that she asked Jim Freeman to come again and perform a marriage ceremony and told him 'If you will stay with me until the program is over, you will never regret it.' Jim refused and advised her that she would have to get some one else.

"Sarah told Betty Carolina that she wanted Betty to stay with her and she 'would never regret it' and to do all she could in her behalf and asked Betty to speak well in her behalf if Uncle Peter should ask Betty anything concerning her. Sarah told Jim Freeman, after the first

marriage was attempted, 'We can't afford for him to die now until the program is pulled off.'

"From the foregoing remarks it is evident that Sarah was pursuing her plans for marrying Peter Lincoln with considerable diligence. Finally a marriage ceremony was performed. On the 17th day of June, 1935, a marriage license was procured by Jim Freeman and delivered to Sarah. Uncle Peter had been ailing most of the time and shortly before the marriage he had suffered a severe illness. On the morning of the ceremony he was physically weak and was sitting in his chair. Eddie Bruner had helped him slip his trousers on over his nightgown and he was unable to get in and out of bed alone. Thus, we have the groom at the age of 89, blind, weak, almost deaf, with his trousers pulled on over his nightgown, ready to go through a marriage ceremony with Sarah. Any observer of such ceremony could not help but wonder as to the motive for such a marriage, and in seeking the motive would not look further than to inspect the bank account and a list of the property owned by the prospective groom. The justice of the peace appeared and started to perform the ceremony. Sarah stood up, but Uncle Peter was too weak to stand and remained sitting in his chair. After the ceremony was performed no words were said and the parties went on about their affairs in the usual manner. Not long after the marriage Sarah left Uncle Peter and went to Colorado and stayed about three weeks, and later she made another trip to Colorado and stayed about a month, which refutes the idea that she desired to marry Uncle Peter in order that she might better take care of him.

"After the marriage ceremony was performed Uncle Peter continued to get weaker and weaker. His memory was bad and he had frequent spells of fever. In an attempt to carry on a conversation he would ask questions and wait five or ten minutes and ask the same questions over. He had sinking spells about every other week during the three months preceding his death. His sick spells were of such intensity that he would spend about a week in bed then probably be able to be up three or four days before another spell would hit him. It was in this condition and on the 16th day of October, 1936, that the execution of the will offered for probate was procured."

For the purposes of this opinion we are assuming that the foregoing is true, with two exceptions. Those exceptions are: First, the evidence reveals that the testator himself sent for the second marriage license, and voluntarily went through the marriage ceremony; second, the will was not executed while testator was actually in the condition described in the last paragraph of the above quotation.

We first consider the question of undue influence. If it be assumed that Sarah Bashears did unduly influence Peter Lincoln to marry her, and that she did it solely for the avaricious purpose of acquiring a portion of his estate, such proof alone is not sufficient to establish undue influence in the execution of the will. In the absence of evidence, we cannot assume, and neither could the trial court, that she exercised undue influence on him in the execution of his will, or to cause him to make a will at all. There is no evidence whatsoever to the effect that she exercised undue influence, as that term is known to the law, or any influence, in the latter respect. The will was executed approximately a year and a half later than the marriage. In the meantime he had executed a similar will, it is true, and then executed the will in question after one of the beneficiaries in the former will had been killed. Nevertheless, there is a total absence of evidence of undue influence by Sarah Bashears Lincoln. The evidence reveals only that they led a peaceful and harmonious married life to the time of testator's death. Suppose Peter Lincoln had lived ten years longer than he did live, and that during all of that time they had been a peaceful and happy couple, and that we had only the same evidence as we have here, namely, that she married him for avaricious purposes. Obviously her corrupt motives in marrying him in the first instance would be insufficient, standing alone, to invalidate the will.

Undue influence, such as will invalidate a will, must be something which destroys the free agency of the testator, *at the time when the instrument is made*, and which, in effect, substitutes the will of another for that of the testator. Mere suspicion that undue influence was brought to bear is not sufficient to justify the setting aside of the will. In re Swartz's Will, 79 Okla. 191, 192 P. 203, 207, 16 A. L. R. 450; In re Anderson's Estate, 142 Okla. 197, 286 P. 17. The unsoundness of mind, or undue influence, which will defeat a will, must have been operative at the time the will was executed. In re Anderson's Estate, supra. As stated by us in Canfield v. Canfield, 167 Okla. 590, 31 P.2d 152:

"We have carefully studied the facts found by the trial court, and find that the judgment denying probate to the will and

canceling the deed on account of undue influence is based upon the following findings: First, that the marriage was purely mercenary; that defendant had no affection for the testator by reason of his peculiarities, personality, and advanced age. We cannot say whether or not this marriage was prompted by love or by mercenary motives, or whether after marriage a relationship of genuine affection developed between the parties; but we say that such is not the determinative issue. It is of little benefit in passing upon the validity of a will to examine into the love and affection held by the beneficiary towards the testator. We would be more concerned in inquiring into the affection held by the testator for the beneficiary, for this would throw some light upon the intention of the testator, as it is but natural that the object of his affection would likewise be the object of his bounty."

On the question of testamentary capacity the case is simple. As stated at the beginning, the evidence that testator was in his sound mind and possessed those characteristics necessary to testamentary capacity, on the date when the will was executed, was undisputed. The only testimony of contestant as to the physical or mental condition of testator, at or near the time of the execution of the will, was the statement of two witnesses to the effect that his memory was bad and that he was physically weak. A testator has a sound mind for testamentary purposes when he can understand and carry in mind, in a general way, the nature and situation of his property and his relations to those who naturally have some claim to his remembrance, and to those in whom, and the things in which, he has been chiefly interested. Payton v. Shipley, 80 Okla. 145, 195 P. 125; McClure v. Kerchner, 107 Okla. 28, 229 P. 589. There was no evidence that testator in the instant case did not measure up to those requirements. The evidence being insufficient to support a finding either of undue influence or lack of testamentary capacity, the trial court did not err in sustaining the demurrer thereto.

It is also contended that the fraud of proponent should invalidate the will. In this connection it is pointed out that in 1921, more than 14 years prior to the marriage of proponent Sarah Lincoln and testator, the proponent filed suit for divorce in the state of Colorado against a former husband, and obtained an interlocutory decree of divorce, which had not become final when she married testator. It is argued that under the laws of Colorado the findings of fact and conclusions of law in the Colorado case which set forth that she was entitled to a divorce did not constitute a divorce and that same could not ripen into a final divorce until one of the parties to the action should apply by motion for a final decree. It is also pointed out that in 1937, after the death of testator, proponent did thus procure her final decree of divorce from her former husband in the Colorado case. Decisions of other courts are cited by plaintiff in error to the effect that if a woman having a living husband conceals the fact and induces another to marry her, who then makes a will in her favor because he believes her to be his wife, such testamentary disposition to her will be held void. In re Dries' Will, 69 N. J. Eq. 612, 55 Atl. 814. In re Carson's Estate, 184 Cal. 437, 194 P. 5. We do not pass on this question. The validity of that portion of the will devising property to the proponent is not properly triable in the present action, the instant proceeding being only for the probate of the will. We have repeatedly held that in a proceeding to probate a will the only question triable is the factum of the will or the question of devisavit vel non. In re Allen's Will. 44 Okla. 392. 144 P. 1055; Brock v. Keifer, 59 Okla. 5, 157 P. 88; Ward v. Cook, 152 Okla. 234, 3 P.2d 728, 729. In Mantz v. Gill. 147 Okla. 199, 296 P. 441, testatrix sought to dispose of her property to the exclusion of the surviving husband. The surviving husband contested the probate of the will and the district court refused to admit it to probate. This court reversed that decision. pointing out that the admitting of the will to probate cannot determine the validity of distribution, but that such question is for consideration in later proceedings. It is therefore unnecessary and improper for us at this time to rule on this contention.

The judgment is affirmed.

BAYLESS. C. J., WELCH, V. C. J., and OSBORN, CORN, GIBSON, and HURST, JJ., concur. RILEY and DAVISON, JJ., absent.