## McCLURE, Ex'r, v. KERCHNER.

No. 14512—Opinion Filed Sept. 30, 1924.

(Syllabus.)

**1. Wills — Appeal to District Court — Jury Trial—Verdict Advisory.**

On appeal to the district court from a judgment of the county court admitting a will to probate, the former court may, in its discretion, make an order for a trial by jury of any. or all the material questions of fact arising upon the issues between the parties. But in such case the verdict of the jury will be merely advisory to the court, and he may adopt or reject their conclusion, as he sees fit; for the whole matter must be eventually be left to him to determine. (Kindt et al. v. Parmenter et al., 83. Okla. 116, 200 Pac. 706.)

**2. Appeal and Error—Review of Evidence in Equity Cases.**

In a case of purely equitable cognizance, this court will review the entire record and will, if it appears that the judgment of the court below is contrary to the clear weight of the evidence, reverse the judgment of the trial court and render or cause to be rendered such judgment as should have been entered at the trial.

**3. Wills — Testamentary Capacity—"Sound Mind."**

A testator has ·a sound mind for testamentary purposes when he can understand and carry in mind, in a general way, the nature and situation of his property and his relations to those who naturally have some claim to his remembrance and to those in whom and the things in which he has been chiefly interested. (Payton ·v. Shipley, 80 Okla. 145, 195 Pac. 125.)

**4. Same—Failing Memory from Old Age.**

The testator must have sufficient memory to comprehend the conditions of his property and his relations to the objects of his bounty, but the fact that the memory of an old person has failed somewhat does not of itself invalidate his will, as occasional lapses of memory, mere decay or feebleness of memory or absent mindedness, ought not to invalidate a will unless amounting under our general rule to a mental incapacity to collect the particulars essential to a just testamentary disposition.

**5. Same—Presumption of Sanity.**

A presumption of sanity goes ·with everyone, and the burden of proving unsoundness of mind in a will contest rests on the contestant.

**6. Same—"Undue Influence."**

Undue influence, such as will invalidate a will, must be something which destroys the free agency of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution. Mere general influence, not brought to bear on the testamentary act, is not undue influence: but, in order to constitute undue influence, it must be used directly to procure the will, and must amount to coercion destroying the free agency of the testator. Mere suspicion that undue influence was brought to bear is not sufficient to justify the setting aside of the will. (Kindt v. Parmenter et al., 83 Okla. 116, 200 Pac. 706.)

**7. Judgment Revoking Probate of Will Not Sustained.**

Record examined, and the judgment of the trial court found to be against the clear weight of the evidence.

Error from County Court, Woods County: Arthur G. Sutton, Judge.

In the matter of probate of will of Emanuel Kerchner. deceased. Nick E. Kerchner protestant. In the district court, on appeal from county court, the probate of will was revoked, and L. E. McClure, executor, brings error. Reversed and remanded, with directions to admit will to probate.

E. W. Snoddy, for plaintiff in error.

R. M. Chase, for defendant in error.

GORDON, J. This is an appeal by L. E. McClure, executor of the will of Emanuel J. Kerchner, deceased, from a judgment of the district court of Woods county, revoking the probate of the will of said Emanuel J. Kerchner, deceased, said will having been admitted to probate in the county court of Woods county, on the 9th day of May, 1922, and the said McClure having duly qualified as executor under said will. From the judgment of the county court admitting the will to probate, Nick K. Kerchner, protestant, appealed to the district court, and upon the trial of the appeal, the district court impaneled a jury and submitted to this jury two questions of fact:

"First: Was the testator, Emanuel J. Kerchner, incompetent to make a last will and testament at the time of the execution of the purported will? and

"Second: Was the said Emanuel J. Kerchner. at the time of the execution of the purported will, acting under undue influence, menace and duress?"

Both of these interrogatories were answered in the affirmative by the jury. Thereupon, the trial court approved, confirmed, and adopted such findings of fact by the jury and decreed that the last will and testament of said Emanuel J. Kerchner be set aside and held for naught. It was further decreed by the trial court that the order and decree of the county court admitting said will to probate and appointing L. E. McClure executor thereof be set aside and revoked, and directed that the proceedings in the district court be remanded to the said county court for further proceedings in accordance with the judgment and decree thereof.

Motion was made by plaintiff in error, the executor, to set aside the findings of the jury, and motion for new trial in the cause was made by plaintiff in error. Both of said motions were by the court overruled, exceptions saved, and appeal regularly taken to this court. The will is as follows:

"Know All Men by These Presents: That I, Emanuel J. Kerchner of Kiowa, in the county of Barber, in the state of Kansas, being in good health (or ill health) and of sound and disposing mind and memory, do make and publish this, my last will and testament, hereby revoking all former wills by me made; and as to my worldly estate and all the property, real, personal or mixed, of which I shall die seized and possessed, or to which I shall be entitled at the time of my decease, I devise, bequeath and dispose thereof in the manner following, to wit:

"First: That all my funeral expenses, and any expense occurring from sickness, be paid in full out of the proceeds of my estate.

"Second: To my grandson, Harry Burns, I bequeath the school land, being the northeast quarter of section thirty-six (36), township twenty-nine (29), range thirteen (13) in the county of Woods, Oklahoma; Provided that he assume and pay all assessments due the government as it becomes due.

"Third: To my son, Nick K. Kerchner, I bequeath one promissory note, the amount being $1,470.50, dated April 10, 1917; also one promissory note. being in amount $500, dated May 25th, 1918; also any bills I may have paid out for improvement on his school land in Harper county, Okla.

"Fourth: To my daughter, Ninnie Burns, I bequeath the sum of ten dollars ($10.00).

"Fifth: To my grandson. Harry Burns, I bequeath the southeast quarter of twenty-five (25), township twenty-nine (29), range thirteen (13) in the county of Woods, Okla., provided, that he pays Nick K. Kerchner the sum of eleven hundred and seventy-three dollars and 50-100 (1,173.50), the same to be paid in two equal payments of five hundred eighty-six and 75-100 dollars ($586.75) the first payment one year after my decease, and the second one year thereafter.

"Sixth: All moneys or bonds that I may have are to be equally divided with my son Nick K. Kerchner and my grandson, Harry Burns.

"And lastly, I do nominate and appoint L. E. McClure to be the executor of this, my last will and testament.

"In Witness Whereof. I, the said Emanuel J. Kerchner, have to this, my last will and testament, subscribed my name, this 17th day of April, A. D. 1920.

"Emanuel J. Kerchner, Testator.

"Signed. Published and Declared, by the said Emanuel J. Kerchner as his last will and testament, in the presence of us, who, at his request. and in his presence, and in the presence of each other, have subscribed our names as witnesses thereto; and at the time

we know the said Emanuel J. Kerchner to be of sound and disposing mind and memory.

"Witness Our Hands, the day and date above given.

"Z. H. Tibbetts,
"W. H. Harris,
"Witnesses."

Several distinct assignments of error are made, but all have been abandoned except the sixth assignment, which is as follows:

"Sixth: That the judgment of the court was contrary to the weight of the evidence."

This question alone is argued in this court by the parties, and the controversy is further simplified by the action of the contestant upon the trial in the district court in eliminating all questions save the two touching the competency of the maker of the will, and the question whether at the time of making said will the devisor was under undue influence, menace or duress.

At the outset of the consideration of the matters involved in this appeal, we are confronted with the question as to what rule governs touching the weight to be given to the verdict of the jury and to the judgment of the trial court approving same. Both parties agree that this is an equitable action. On the one hand, it is contended that the findings of the trial court should be sustained unless it appears that such findings are clearly against the weight of the evidence. Speaks v. Speaks, 98 Okla. 57, 224 Pac. 533; Voris v. Robbins, 52 Okla. 671, 153 Pac. 120; Checote v. Berryhill et al., 48 Okla. 696, 150 Pac. 679; Asher v. Doyle, 50 Okla. 460, 150 Pac. 878; Jenks v. McGowan, 9 Okla. 306, 60 Pac. 239. On the other hand, the rule invoked is that we shall weigh the evidence and here render such judgment as the lower court should have rendered if we find that the judgment of the trial court is clearly against the weight of the evidence. We think there is no material difference between the parties plaintiff in error and defendant in error here as to our duty in considering the evidence, and we will therefore proceed to weigh the evidence and to determine whether the verdict of the jury and the judgment of the trial court are clearly against the weight thereof.

Before examining into the testimony, it is well to have before us those cardinal rules of law governing us in determining whether the evidence in this case is sufficient to justify us or was sufficient to justify the trial court in rendering judgment to the effect that the testator, Kerchner, was, at the time he executed his last will and testament, in such condition mentally that he was in

law incompetent to make the will, or was subject to such influence that the making of the will was in effect not his own voluntary act, rather was the act of the party exercising this undue influence, and first we will advert to the question of incompetency.

In Schouler on Wills (6th Ed.) vol. 1, section 97, we find the following:

"Where we come to examine in detail the various classes of cases where sanity and the capacity to make a will have been in controversy, the general doctrine, as above stated, will more clearly appear with its qualifications. We shall find that the criterion in such cases is best taken as sui generis and not referred to the standard of general contract capacity; though unquestionably the habit and capacity of any testator to actively transact his ordinary business and make his own contracts furnish strong evidence of the capacity at issue. The vital question in any such cases should be whether upon all the evidence the particular instrument propounded for probate was or was not under all the circumstances the real testamentary disposition (and the last one, of course) of a mind neither deranged in producing it, nor operating under stress of error, fraud, or undue influence, as he must be able to reason and will soundly in relation to the transaction. And to decide this question properly requires a careful view of the particular case in all its bearings without too rigid an adherence to any general maxims of capacity. The time and place to be regarded in determining the validity of the will should be essentially the time and place of its execution.

"It is axiomatic that testamentary capacity is tested from the date of execution of the will, and although we shall see later that evidence of his condition before and after that time is admissible, such testimony is only important as having some logical bearing on his condition at the time of execution.

"Where one's mental condition appeared to his medical attendant suitable for the testamentary act, or the reverse, shortly before or after the will was made, testimony to this purport should carry great weight. But after all, the real point at issue upon which such testimony bears, is the mental condition and the state of surrounding circumstances, at the precise time of the testamentary act."

In section 98 of said volume, it is said:

"The testator must have sufficient memory to comprehend the conditions of his property and his relations to the objects of his bounty, but the fact that the memory of an old person has failed somewhat does not of itself invalidate his will, as occasional lapse of memory, mere decay or feebleness of memory, or absent-mindedness, ought

not to invalidate a will, unless amounting, under our general rule, to a mental incapacity to collect the particulars essential to a just testamentary disposition."

Section 99 of the same volume is as follows:

"It is a general rule that testamentary capacity consists in the ability to understand the nature of his property, the natural objects of his bounty, and the nature of the testamentary act, and it is sometimes said that it is sufficient if he knows of what his estate consists and the persons to whom he desires to give it.

"This rule does not mean that all these things must be known by the testator minutely, but if he knows them in a general way, this is enough. * * *"

In Payton v. Shipley, 80 Okla. 145, 195 Pac. 125, we find the following in the second paragraph of the syllabus:

"He must understand the act which he is doing and the relation in which he stands to the objects of his bounty and to those who ought to be in his mind on the occasion of making his will."

In Re Blackfeather's Estate, 54 Okla. 1, 153 Pac. 839, it is said:

"The mere fact that she was an aged person in no way operates against the validity of the will made by her, but every presumption tends to uphold its validity. Underhill on Wills, sec. 114.

"A presumption of sanity goes with everyone, and the burden of proving unsoundness of mind in a will contest rests on the contestant. In re MacCrelish's Estate, 167 Cal. 711, 141 Pac. 257, L. R. A. 1915 A, 443."

In Driesbach v. Spring, 93 Kan. 240, 144 Pac. 195, it is said:

"The only thing that concerns courts and jurists in cases like the one at bar, is whether or not there was testamentary capacity, and a will cannot be set aside because juries or courts, called upon to review the disposition of property made by the testator, may feel that such disposition was unreasonable, harsh, or unjust."

See, also, In re Clark's Estate (Cal.) 149 Pac. 828; Gardner on Wills, pages 102-105, 108, and 110.

Having these rules in mind, we must examine the testimony before us in order to determine whether it is sufficient to sustain the judgment of the trial court to the effect that at the time of making his will the testator, Kerchner, was incompetent and that when said will was made, his mental faculties were so impaired that the instrument executed by him was void.

Plaintiff in error has included in his brief a fairly complete abstract of all the testimony upon the questions at issue. The correctness of the abstract has not been questioned by defendant in error, although defendant in error has submitted in his brief his own abstract of the testimony on his behalf. We find no substantial variance between the two. We have carefully read the entire record and find therein nothing of serious importance or weight had been omitted by the parties in their briefs. We deem it important to deal more particulary here with the evidence adduced by defendant in error because it is here only that we must hope to find a sufficiency of proof to justify the judgment of the trial court. On the question of competency we find in the evidence the testimony, first of Nick K. Kerchner, son of the testator, who is the protestant. His testimony is, substantially, "that many times his father would start to tell a story, and would tell about half of it and would then just quit off in the middle of the story. That he first noticed this since his mother died in 1916. That in his judgment he was not right. That he would sometimes meet a man and shake hands with him, and shortly after that he would meet him again and would again shake hands with him, apparently having forgotten the first meeting."

From these circumstances he concluded that his father's mind was not right.

J. N. Newman testified that the testator, Kerchner, was not an educated man; that he had a little education, but did not have a great deal; that he would get bothered so that he could not use what he had. That he could not multiply or subtract; that when witness first came the testator's mind was a whole lot better than it was during the last; that he would take crying spells; his recollection was not good. He worried and cried when he was by himself; that he was not a good salesman. When asked whether in the opinion of the witness the testator knew the nature or comprehended the extent of his business transactions, and the nature and value of his property, the witness replied:

"I don't know whether he did or not; he never told me no price on his property but once; once he told me." (R.-P. 107.)

J. R. Wasson testified that from 1915 to 1919, he was acquainted with the testator, Kerchner; that Kerchner would come in his store and buy a few groceries and cigars. This witness testified as follows:

"Q. Will you explain what it was you observed about him?

"A. Overconfidence seems to me like one thing.

"Q. Overconfidence?

"A. Overconfidence.

"A Now, for instance he would come in and buy, oh, I don't know as I could specify the number of things, several things, though that he would buy, may be just a cigar and throw down a five or ten dollar bill and I would throw him his change, and there was a time or two that I remember that he would start off without his change, and may be then he wouldn't count it at all, pick it up and throw it in his pocket, and that is what I mean by overconfidence." (R. 116.)

Nellie Headwick, daughter of Nick Kerchner, the protestant, testified that she saw the testator in the year 1919; that she would sometimes go with her father, Nick Kerchner, to her grandfather's and her grandfather would ask her where her husband was and may be a few minutes after he would ask her the same question again. (R. 141.)

All of the witnesses on both sides of the controversy testified that many years, probably 30 years, before his death Emanuel Kerchner was crippled by the fall of a mule upon him; that a good many years he walked with a cane and later used a crutch, and during the last years of his life used two crutches.

The will was made April 17, 1920, and Emanuel Kerchner died in the month of April, 1922. The testimony outlined above is substantially all the testimony introduced by defendant in error, the protestant, touching the question of the mental competency of the testator for several years prior to the time of making his will. We are not yet adverting to the question of undue influence. On the other hand, numerous witnesses were called by plaintiff in error, 15 or 20 in number; witnesses who had known the deceased for a number of years, who testified that although he was physically crippled, he had been a man who attended well to his business affairs, a man of more than ordinarily strong mind; and it was agreed by both parties hereto in the trial that he had accumlated considerable property, and that the property involved in the will was worth approximately $30,000, consisting of two farms, the crops raised thereon for the current year, a liberty bond and several hundred dollars in corporate stocks.

An examination of all this testimony convinces us beyond serious doubt that at the time he made this will, Emanuel Kerchner was competent and in possession of his mental faculties to such an extent that he knew well the property which he possessed, the indebtedness due him, his relation to his kindred, his duty toward such kindred. That he knew the diposition which he desired to make of his property and that the will which he executed expressed his intentions. We are particularly impressed with that testimony of George L. Cook, who drew the will; of Dr. W. H. Harris, one of the attesting witnesses, and of L. E. McClure, the executor. It appears that upon the recommendation of a friend, who was in no wise interested, the deceased went to Cook and stated to him that he desired to have his will drawn. Cook had known Emanuel Kerchner for a number of years, but had not been connected with him in any way, and as far as the testimony goes had not attended to any business for him. Emanuel Kerchner came into Cook's office on the 17th day of April, 1920, by himself. It does not appear that any person came to town with him. He stated plainly and with clearness to Mr. Cook the property which he had and the disposition which he desired to make of it by will. He acted and talked normally, talked with Cook about his relations. Cook took down with pencil the instructions given him as to the provisions of the will, read them over to Kerchner and asked him if they met his approval. He said they were exactly what he wanted; stated that he held a note against Nick Kerchner and desired to give him that note; that Harry Burns had treated him more kindly than his own son. Cook then drew the will on the typewriter, read it over to Kerchner. It was satisfactory.

Dr. W. H. Harris, the physician who knew Kerchner well, and had treated him for many years, was called as one witness to the will, and Dr. Tibbets as another witness. Both of those men had offices in the same building where the will was drawn. They were requested by Kerchner to witness the will when he had stated to them that it was his last will and testament. They did so, and Kerchner then took the will and went away.

Dr. W. H. Harris, one of the attesting witnesses, had been acquainted with Kerchner for 25 years. Had seen his frequently during that time and had acted as his physician. He testified that his mental condition did not change from the time he first became acquainted with him up to the time he saw him a short time before his death, and Dr. Harris attended him in his last illness.

L. E. McClure, the executor and a banker, had known Kerchner since 1912. Kerchner had kept his papers in that bank. Kerchner brought his will to McClure in the bank on the date it was executed, told him that it was his will and he wanted it put away for safe-keeping. McClure put the will in Kerchner's safety box with the rest of his papers and after Kerchner's death broke the seal on the envelope, brought the will to Alva and turned it over to the county judge. Mc-Clure was acquainted with Kerchner in a business way. Deceased Kerchner had kept an account at McClure's bank for years and always transacted his own business without the assistance of any one. When he brought the will to McClure there was no one with him, He transacted business with the bank just the same afterwards as before the will was deposited there. McClure says that the deceased was entirely capable of carrying on his business, understood the nature of all business transactions, and the value and extent of his property, and that he noticed no difference in the deceased from the time he first became acquainted with him until the last time he saw him, shortly before his death.

The substance of this testimony as to the normal condition of the mind of Emanuel Kerchner is sustained by the testimony of many witnesses, all of whom had thorough opportunity to judge of his condition during many years and up to the time of the making of his will and up to the time of his death.

All this testimony has convinced us that the testator, Kerchner, was at the time of making this will of sound mind, and the testimony introduced by the protestant does not, in our judgment, when considered in its most favorable aspects, reach the point where it raises in our mind any serious doubt as to the competency of the testator.

We therefore find that the judgment of the trial court upon this branch of the case was not sustained by sufficient evidence and was against the great weight of the evidence.

2. We proceed now to the second proposition, which is a question of fact submitted to the jury by the following interrogatory:

"Was the said Emanuel J. Kerchner at the time of the execution of the purported will acting under undue influence, menace, and duress?"

This question, being submitted to the jury, was answered by the jury in the affirmative, but the verdict of the jury was merely advisory to the court. After all, the question had to be decided by the court. We will first cite the approval rules touching the question of undue influence, but will say in passing that the sole question here is that of "influence," there being nothing in the record to indicate menace or threats. In Schouler on Wills (6th Ed.) vol. 1, section 262, we find the following:

"Undue Influence Defined. Something sinister is always imputed in the present connection.

"Undue influence is defined as that which compels the testator to do that which is against his will, from fear, the desire of peace, or some feeling which he is unable to resist. We say that the influence must be undue, in order to vitiate the instrument, because influences of one kind or another surround every rational being, and operate necessarily in determining one's course of conduct under every relation of life. Within due and reasonable limits such influence affords no ground of legal objection to his acts. * * * It is sufficient to say that, allowing a fair latitude of construction, they must range themselves under one or other of these heads—coercion or fraud."

Section 270 of the same volume is in part as follows:

"The test is whether the testator made the will as requested simply to 'buy his peace' from the importunate beneficiaries, and the mere fact that proponents desired to get the money of testatrix and told her so is not undue influence.

"On the other hand, mere honest argument or persuasion, earnest solicitation, and such influence as one person may deservedly obtain over another are as a rule insufficient to affect the validity of a will, in the absence of decisive fraud, even though one should by such means procure a disposition in favor of himself or of someone else whose interest he has maintained. * * *"

Section 271 reads in part as follows:

"The constraint of fraud or undue influence necessary to set aside a will must be a present restraint, fraud or undue influence, operating upon the testator's mind in the very act of making the will, and affecting its execution or the disposition it makes, as the undue influence must dominate testator at the time of making the will and contemporaneous threats have this effect. * * *"

Section 276 is as follows:

"Influence based on affection for members of a family is not undue influence, as such influence is natural and proper and in a different class from that which a stranger may obtain."

See, also, Gardner on Wills, pages 177-185-192-193-197.

In Kindt et al. v. Parménter et al., supra, the first and fifth paragraphs of the syllabus are as follows:

"1. On appeal to the district court from a judgment of the county court admitting a will to probate, the former court may, in its discretion, make an order for a trial by jury of any or all the material questions of fact arising upon all the issues between the parties. But in such cases the verdict of the jury will be merely advisory to the court, and he may adopt or reject their conclusions as he sees fit; for the whole matter must eventually be left to him to determine."

"5. Undue influence, such as will invalidate a will, must be something which destroys the free agency of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution. Mere general influence, not brought to bear on the testamentary act, is not undue influence; but in order to constitute undue influence, it must be used directly to procure the will, and must amount to coercion destroying the free agency of the testator. Mere suspicion that undue influence was brought to bear is not sufficient to justify the setting aside of the will."

In the case, of In re Cook's Estate 71 Okla. 94, 175 Pac. 507, on page 96 (page 509 of 175 Pac.), in an opinion by Mr. Justice Kane, this court said:

"Undue influence, such as will invalidate a will, must be something which destroys the free agency of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator."

And on same page (page 510 of 175 Pac.), it is said:

"The express intentions of the testator should not be thwarted without clear reason therefor. The right to make a will includes the right to make it according to the testator's own desire, subject only to the statutory restriction."

See, also, Clapp v. Fullerton, 34 N. Y. 190; Potter v. Jones (Ore.) 25 Pac. 796.

In the case of In re Swartz's Will, 79 Okla. 191, 182 Pac. 203, on page 195 of the opinion (page 207 of 192 Pac.) Mr. Justice Pitchford, speaking for the court, says:

"In determining whether the testatrix at the time of the execution of the will was free from undue influence, her declarations as to her intended disposition of her property, made prior to the execution of the will, are very important."

Turning to the facts in the instant case, we examine, first, the testimony adduced by the contestant of the will, to determine whether it sustains his contention of undue influence. We find only two witnesses testifying to any state of facts which would suggest undue influence. The first, and most important, of these is Mrs. Mira N. Lockwood. Her testimony begins on page 207 of the record. Mrs. Lockwood had known Emanuel Kerchner for about 30 years. She knew his children and the grandchild, Harry Burns. She had a room at the Commercial Hotel in Kiowa, and at different times Kerchner came to the hotel and stayed several days. Kerchner came to see Mrs. Lockwood in November or December, of the year 1919. The witness testified that she was in her room, crippled; that Kerchner was crippled, but he came upstairs to her room and sat down and they had a talk. That he was terribly upset and cried during the time he was there. She says he told her that they were having trouble out there and that he couldn't stay there unless he made the will in Harry's favor; that they just wouldn't have it any other way; but he said he didn't want to make a will and cut Nick out of his one-half of the property; that if his wife knew he was trying to beat Nick out of his one-half of the property she would turn over in her grave. He said Harry (his grandchild) just worried him to death about making his will; that his daughter Nina told him to make everything over to Harry. He said Nick had broke every foot of that land, and talked like he thought just as much of Nick as he did of the rest of the family. That he seemed to like all of his children; that a few days afterwards, Mrs. Nina Burns told her that her father could not stay at home with any peace on Bob's account (Bob was Kerchner's son-in-law, the husband of Nina Burns); that Nina said she thought her father ought to make the property over to her and Nick, half and half. That was what she said she thought would be right. That in her conversation with Emanuel Kerchner he said that he was willing to make a will and give half to Nick and half to Nina, but that he didn't want Bob to get hold of any of his money. That he wanted to give Nick one-half and Harry one-half, but that witness told him not to do it "give Nina her one-half; Harry is a young man and he can get his afterwards." This is the substance of her testimony.

In addition to this is the testimony of

Nick Kerchner, found on page 55 of the record, wherein he testified that Harry Burns at one time during the year 1919, told him that he would give witness $4,000 for his part of the estate and give him his notes back. That if witness didn't take it, he would · make grandpa give it to him (Harry). Both of these alleged conversations occurred in the fall of the year 1919, and not later than December of that year. Harry Burns denies the alleged conversation with Nick Kerchner and Nina Burns denies the alleged conversation with Mrs. Lockwood. The will was not made until April 17, 1920. From the fall of 1919 until the time the will was made, the record is wholly silent as to any influence attempted to be used upon the testator, or as to any conversations between the testator and the members of his family touching the disposition of the property. If this testimony of protestant is proved, it indicates that Robert Burns and Harry Burns were, during the fall of 1919, arguing with Emanuel Kerchner as to the disposition of his property, and insisting that it should be willed to them, or to Harry. Notwithstanding this, there appears to have been no friction and no ill-feeling on the part of the testator outside of the conversation specified, and he continued to live with his grandson.

The substance of the testimony covering the situation is that the testator seemed to have the kindest feeling toward his daughter, Nina, his son, Nick, and his grandson, Harry Burns. He thought, and talked to several witnesses as to how he was going to dispose of his property. He told several witnesses that Nick Kerchner had had his part, and it appears that he had notes given by Nick Kerchner amounting to a considerable sum of money that he had advanced Nick from time to time. He owned two pieces of land, one the home place and the other a quarter section of school land. The home place was clear; the school land was incumbered. Testator stated a number · of times and to a number of persons that Harry Burns, his grandson, had gone overseas to war, that he was uneasy for fear he would not come back. A young woman had come to testator's home when his wife was sick and nursed the wife, and after the death of the wife, about 1916, she continued to stay at the testator's house and take care of things while Harry was in the army. The testator stated that she was a good girl; that when Harry came home he wanted him to marry this girl and settle down at the old home place and he would will his land to him. Outside of the testimony of Mrs. Lockwood we find that the disposition of the property by the will

is practically in harmony with the statements which the testator had been making for several years as to how he intended to dispose of his property. Harry Burns did come home from the war, he did marry the young woman at the home of testator, and the testator lived there with them from that time on. It seems to us not unnatural that the testator should have had a great affection for this young man who had gone to war, had come home, had followed the suggestion regarding marriage, and settled down and lived at the old home place. Nothing in the record indicates any mistreatment by Harry Burns or any unpleasant relations between them, if we leave aside testimony of Mrs. Lockwood. There is nothing in the record to show that the testator ever mentioned to any of the family the fact that he had made a will, or its contents.

In 1921, after the will was made, he paid a long visit to his son, Nick Kerchner. Nick had married once, had separated from his wife, had married again and had moved away from the neighborhood of the old home place. Doubtless the ties between these two men were not so strong and close as they had been in the earlier days when Nick, as a young man, had broken out the land on the home place and worked there for his father, yet the utmost good will seemed to exist between them. During this long visit to Nick, Emanuel Kerchner did not mention to Nick that he had made a will. If he had been unduly influenced to make this will, he had nearly two years in which to undo the deed. If influence was brought to bear upon him in November or December, 1919, it does not appear to have been persistent or been active in April, 1920. If he had been overpersuaded in 1919, it would have been natural that he should have mentioned the fact to his son Nick in 1921, and more natural that he should have left the home place and gone to stay with his son Nick. He did neither of these, but during the two years was satisfied with the will as made. This is strong evidence that he was not coerced. Laberee v. Laberee (Ore.) 227 Pac. 460.

It appears to us that the occurrence alleged in Mrs. Lockwood's room does not fully harmonize with any other portion of the testimony or the acts in this case. The will itself provides certain payments of money to Nick Kerchner, and strange to say, it provides for a first payment in one year and the second payment in two years. It is evident from the testimony that Emanuel Kerchner had no great confidence in Nick's financial ability, but by the will he has

given him this money, has released him from all obligations and given him a one-half interest in all property except the lands. Had he desired to wholly disinherit Nick Kerchner, and done so, that fact would not affect the will. But it appears to us that he has fairly disposed of his property in the manner intended by him for a good many years. That no injustice has been done the contestant. Upon the whole case, we are of opinion that the judgment of the trial court was not supported by sufficient evidence and was against the great weight of the evidence in the case.

It is therefore ordered that the judgment of the trial court be reversed, and this cause remanded, with directions to admit the will to probate.

McNEILL, C. J., NICHOLSON, BRANSON, HARRISON, and JOHNSON, JJ., concur.