Matter of the ESTATE of Stuart Johnson GROVES, Deceased.

Mattie Nora GROVES and Ray C. Payne, as Father and next friend of Raymond Charles Payne and Regina Beth Payne, both minors, Plaintiffs in Error,

v.

Eseral S. GROVES and William L. Groves, Defendants in Error.

No. 36555.

Supreme Court of Oklahoma.

June 11, 1957.

Rehearing Denied Jan. 28, 1958.

A. W. Trice, Ada, George Miller, Jr., Jack Ewing Wilson, Oklahoma City, for plaintiffs in error.

Kerr, Lambert, Conn & Roberts, and Duard C. Willoughby, Ada, for defendants in error.

## PER CURIAM.

Stuart Johnson Groves died June 27, 1953, in Wesley Hospital in Oklahoma City at the age of 74 years, leaving an instrument purporting to be his last will and testament, dated April 10, 1953, in which he specifically named but omitted from participation in his estate his two sons, Eseral Groves and William Groves. They are the contestants. The purported will then left an undivided one-half interest of the estate of deceased to his widow, Mattie Nora Groves, and devised the remaining one-half interest to Mattie Nora Groves, to be held by her as trustee, in trust for the use and benefit of his step-grandchildren, Raymond Charles Payne and Regina Beth Payne, the whole of said trust to vest in the survivor upon the death of either, and each said beneficiary to receive his or her proportionate share of the trust on attaining majority. The widow, and Ray C. Payne, as father and next friend of said two step-grandchildren are the proponents of the will.

The instrument was offered for probate in the County Court of Pontotoc County. Objection was filed thereto on the grounds of mental incapacity, incapacity by reason of drugs, and undue influence. Upon hearing had thereon the County Court denied probate. Upon appeal and trial de novo the District Court made findings of fact and conclusions of law, general in form, sustaining the contentions of the contestants and denying the will to probate. Thereupon proponents filed a motion for new trial and from the trial court's order overruling same have perfected this appeal.

The only question here presented is whether or not the trial court's decision denying probate of the will is against the clear weight of the evidence.

We have many times said that a will contest is a case of equitable cognizance, and that, on appeal, this court will examine the whole record and weigh the evidence. In re Estate of Wadsworth, Okl., 273 P.2d 997.

It is evident that contestants claimed, and the trial court found, that the deceased, at the time of the execution of the will, was incompetent, in that he was of unsound mind, and so under the influence of narcotic drugs as to deprive him of normal reasoning, thereby rendering him incapable of knowing the disposition of his estate;

and at the time of the execution of the will was under undue influence, menace and duress.

After a careful review of the record in this case, which is voluminous, we cannot agree with the contentions of the contestants, nor the findings of the trial court. It is apparent that both the County Court of Pontotoc County and the District Court on appeal based their respective decisions on opinion evidence of two doctors in answer to hypothetical questions, with reference to the amount of narcotics given to deceased the day and night prior to the execution of the purported will, his physical condition, and the testimony of contestants of the friendly relations that had always existed between them and their father.

We here note that one of the doctors testifying for contestants had never seen or talked to deceased and on cross-examination stated that his professional opinion, as to testamentary capacity of the deceased, was largely influenced by his own personal prejudices against a man disinheriting his own children. The other doctor had seen the deceased but one time some five months prior to the execution of the will but wanted it understood that he was giving his opinion based entirely on the clinical records as he interpreted them. Both doctors testified that the doctors in attendance upon deceased were better qualified to determine the mental capacity of deceased than were they who had not seen him.

█ We are also impressed with contestants' lack of testimony relating to undue influence. All such testimony fails to arise to that degree of proof necessary to show that the free agency of the testator had been destroyed or that the will of another had been, at the time of the execution of the will, substituted for that of deceased. In reference thereto we must here state that this court has frequently held that, "undue influence" such as will invalidate a will, must be something which desroys the free agency of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life or that he was surrounded by them and in confidential relations with them at the time of its execution. Mere general influence, not brought to bear on the testamentary act, is not undue influence; but, in order to constitute undue influence, it must be used directly to procure the will, and must amount to coercion destroying the free agency of the testator. Mere suspicion that undue influence was brought to bear is not sufficient to justify the denying of a will to probate. See Kindt v. Parmenter, 83 Okl. 116, 200 P. 706, and McClure v. Kerchner, 107 Okl. 28, 229 P. 589.

█ Before considering the evidence which we think is decisive of the issues here presented, we first consider the established principles of law pertinent to testamentary capacity. This court has consistently held that a testator has a sound mind for testamentary purposes when he can understand and carry in mind, in a general way, the nature and situation of his property, and his relation to the persons around him, to those who naturally have some claim to his remembrance, and to those in whom and things in which he has been chiefly interested, and that he must understand the act which he is doing and the relation in which he stands to the objects of his bounty and to those who ought to be in his mind on the occasion of making his will. See In re Mason's Estate, 185 Okl. 278, 91 P.2d 657, and cases therein cited.

█ There is no arbitrary test of testamentary capacity. Being a question of fact, it must be determined from the condition of the testator's mind at the time of the making of the will. In determining that question, a presumption of sanity will be indulged; and prior and subsequent acts have bearing only to the extent of assisting in determining the mental status of the testator at the time of the execution of the will. In re Holmes' Estate, Okl., 270 P.2d 320.

The law does not require that a testator, in making disposition of his property, shall be humane or even just. Nor does the right of a testator to dispose of his estate as he likes depend on the justice of his prejudices. If he possesses the requisite mental capacity, he has the right to make an unequal distribution of his property among his heirs or to give it entirely to strangers. And under the law of this state where it appears from the will itself that it was the clear intent of the testator to disinherit or exclude his natural children from participation in his estate, such act in itself will not vitiate the will. See 68 C.J. Wills, § 51, page 452, 94 C.J.S. Wills § 35, and In re Adams' Estate, 203 Okl. 377, 222 P.2d 366.

It is here evident, that the testator was a person of unusually strong characteristics; prior to his last illness a man of full physical strength, deep feelings and emotions; a forceful individual with a strong will, not easily influenced. It is apparent that he was a person who did his own thinking, determined his own actions and did what he wanted to do. By reason of his desire to work and his carefulness in his business dealings he had built a sizeable estate. There is no question that during his life with his first wife, he and his sons enjoyed the best of companionship and feelings toward each other. Such mutual feelings between the testator and his sons (the contestants) seemed to exist until January, 1947, at which time testator was divorced from his first wife and their property divided equally between them. From this time on there is evidence of only one visit between testator and his son William, and that at the instance of testator while William was in a hospital as a result of military service. Cordial relationship seemed to exist between testator and his son Eseral until 1949, after which time they spoke to each other only three times, twice in chance meetings on the street, and once for a period of approximately 10 minutes, nine days after execution of the will in question. This last mentioned visit was the only visit by either of contestants with testator during his last illness.

Various witnesses, including Dr. Dean, family physician of testator, and Reverend Lambert, minister of testator's church, testified that in conversation with testator, many weeks prior to execution of the will, he had informed them that his sons were well fixed, would be amply provided for from his first wife's estate and that he intended for his second wife and his two step-grandchildren to have his estate. The record also discloses that there was a deep and loving affection between testator and his second wife and especially between testator and his two step-grandchildren. Various witnesses testified that from 1950 on testator took both children with him whenever he was inspecting his farm and that they were constantly in attendance with him on occasion of visits to their home.

There is no question that testator's last illness began in November, 1952. At that time he entered a hospital in Ada for a comparatively minor operation. He was discharged therefrom and readmitted on December 28, 1952; recovering he was discharged but returned thereto on March 22, 1953. He was immediately transferred to Wesley Hospital in Oklahoma City. At this time he was in acute pain, his abdomen badly distended, and minor surgery performed to relieve this condition. On April 7, 1953, an operation was performed known as a colostomy. It was then found that testator was suffering from cancer which had attached itself to the abdominal wall. Postoperatively, on April 9, 1953, he was given demerol and luminal to relieve pain, and on April 10, 1953, at about 9:30 A.M. was informed by his attending physician that this might be his terminal illness. He thereupon requested the doctor to get him a lawyer so he could make his will. A lawyer was sent for who talked to testator privately and at 4:00 P.M. of that same day returned with the typewritten will and in the company with his secretary. The attorney, his secretary, Dr. Dunn, the attending physician, and a registered nurse, all went to testator's room where the secretary was told to take down everything that occurred in the room. These parties and testator were the only parties in the room. The at-

torney asked some preliminary questions. In response thereto testator informed the attorney that he had requested him to draft his will giving one-half of his property to his wife and the remaining one-half interest to his two step-grandchildren; that he had two sons, whom he named but wished none of his property to go to them. The will was then read to decedent, paragraph by paragraph. As each paragraph was read decedent indicated it as his desire. After the instrument was read the decedent signed it with the assistance of the attorney, who he asked to help guide his hand, and in the presence of Dr. Dunn, and the registered nurse, Mrs. Evalyn Hoferer. He declared the instrument to be his last will and testament and requested the attorney, doctor and nurse to sign as attesting witnesses. This they did in his presence and in the presence of each other.

As to testamentary capacity of the deceased, we think there can be no question. The attesting witnesses as well as two other doctors who were in attendance upon testator on the day of the execution of the will; several nurses; a friend and neighbor, who visited with testator that evening, and the attorney who prepared the will, all testified that testator was mentally competent, and not under the influence of drugs; believed he knew of what his property consisted and who his relatives were; knew the persons in attendance upon him, and was sufficiently alert to understand the act of making a will. In fact, all the doctors who testified were highly impressed with the strong will and forceful determination of testator to make his own decisions and to know and understand everything that was going on. Significant to us, and a matter which we think justifies such opinions, is the evidence of testator's personal attorney, Clayton Carder, which discloses that he visited with testator in private on May 16, 1953, which was thirty-six days after execution of the will, and at this time testator informed him that he had made a will; that he wanted Carder to examine it to see if it was legally drawn. We can but attribute this to the natural in-

clination of a person calling on his legal advisor of long standing in whom he has confidence over one unknown to him. This attorney further testified that he obtained a copy of the will and after examination notified the testator by letter, under date of May 27, 1953, that the will was properly drawn.

Although there is testimony herein that the testator became irrational on at least three occasions while he was in Wesley Hospital, one of such occasions being in March prior to the execution of the will, the other times in May and June after its execution, the evidence of proponents is uncontradicted, except as hereafter shown, as to testator's demeanor and appearance and ability to understand the character and extent of his property and the disposition he intended to make of said property when discussing the preparation of a will with the attorney and at the time of executing the same.

Eseral Groves' wife and her sister who had visited testator on April 9th, and on other occasions before and after April 10th, and Eseral Groves who had visited his father on the 19th of April, were all of the opinion and testified that testator was mentally incapable of writing and executing a will on April 10th.

Under the evidence as we view it, and the authorities heretofore discussed, we must hold that the judgment of the trial court is against the clear weight of the evidence.

The judgment of the trial court is reversed and the cause remanded with directions to admit the will to probate.

HALLEY, WILLIAMS, BLACKBIRD, JACKSON and CARLILE, JJ., concur.

WELCH, C. J., CORN, V. C. J., and DAVISON and JOHNSON, JJ., dissent.

DAVISON, Justice (dissenting).

I am unable to agree with the majority opinion. The County Court of Pontotoc County and the District Court on appeal found that the testator did not have testa-

mentary capacity at the time the will was executed. In my opinion, from a review of the record, it cannot be said that the judgment of the trial court is clearly against the weight of the evidence.

The testimony of the witnesses was conflicting in many respects. The trial court had the advantage of seeing the witnesses and to scrutinize their demeanor and interest or lack of interest in the contest.

The evidence shows that testator and his first wife lived together for many years but that in 1942 friction arose between them, that being about the year in which testator and Mattie Nora Payne (now) Groves became acquainted with testator. Mattie was some 24 years younger than testator. In 1943 Mattie and her then husband moved to California. Thereafter Mattie and testator began writing love letters to each other. Testator loaned money to Mattie and her former husband. In April 1946, Mattie divorced her former husband and in January 1947, testator divorced his wife of long standing and in March 1947 testator and Mattie were married.

The evidence is conflicting as to the feeling that existed between the testator and his two natural sons after testator's marriage to Mattie.

On the morning of April 10, 1953, the attending physician of testator called an attorney to consult with testator about the preparation of a will. Mattie had been with testator during the days before the execution of the will. The will was finally executed at approximately 4 P.M. on April 10, 1953.

On direct examination this physician testified as follows as to the condition of testator's mind on the morning of April 10, 1953.

"Q. What was his condition of mind when you talked to him that morning, first? A. All right—quite satisfactory, normal.

"Q. Did he appear to realize the seriousness of his condition? A. Well, he certainly did, because he wanted to do something about it right then; I wanted him to—I thought if he need-

ed anything done that the best thing, probably, would be for him to talk to his own attorney—somebody he knew and who knew something about him, and felt that probably that would be what he would want to do but he wanted to go ahead and do it then and so he, more or less, 'put me on the spot' about it, and so I went ahead to see if I could find somebody that might discuss his legal problems with him.

"Q. Dr. Dunn, the testator, at that time—that first conversation, did he discuss with you then anything about what he wanted to do in the will? A. No, sir."

On cross-examination the "Progress Report" kept by Wesley Hospital but made by the above referred to attending physician in his own handwriting shows the following as to the mental condition of deceased on April 10, 1953:

"10 April 1953: pt. has not shown any improvement today—in fact he is worse. * * *"

On April 9, 1953, the hospital records show the condition of deceased and that the sedatives administered to him were as follows:

"7:30 P.M. Luminal, 2 gr.

"9:00 P.M. 100 Milligrams of Demerol; patient nauseated

"12 Midnight Luminal, 2 gr., patient still nauseated and vomited bright green fluid

"April 10, 1953

"1:00 A.M. Patient vomited dark brown liquid—patient was cold, complained of being hot—perspired freely.

"1:30 A.M. Demerol, 100 Milligrams

"1:40 A.M. Supervisor was called to see patient

"2:00 A.M. Patient resting but respiration labored

"4:40 A.M. Demerol 75 Milligrams, given for rest

"7:00 A.M. Body very cold—right leg very discolored; temperature from

388

8:15 A.M. to 7:00 P.M. in excess of 103°."

The attending physician, Dr. D., also admitted on cross-examination, when confronted with the hospital records, that the testator had been on intravenous feedings almost constantly since his admission to the hospital. That he was pale and gray, or, an ashen color in appearance, from the date of his admission until April 10, 1953; and a greater part of the time his stomach was distended; and had an appearance of sunken eyes and was lifeless in activity for several days prior to April 10; and only moved when required by the doctor to move.

Dr. Coyne Campbell, an eminent mental specialist, testified as to a hypothetical question, which question was based on actual facts introduced in evidence. Dr. Campbell's testimony was as follows in answer to the following questions:

"Q. Now, in view of the fact, Doctor, the next question which I shall ask you is a detailed hypothetical question, which, at the conclusion of the question, it is necessary for you to answer the question 'yes' or 'no.' A. Okay.

"Q. Doctor, assume a man seventy-four years of age, a farmer, in prior good health, who in November 19, 1952 entered the hospital at Ada, Oklahoma, had an operation—a rib resection and drainage of left pleural cavity, and remained in the hospital until discharged on December 23, 1952; that he thereafter returned to the hospital at Ada on December 28, 1952 and had a second operation—rib resection and plastic fistula, remained in the hospital until discharged on January 25, 1953; that he thereafter returned to the hospital at Ada on March 22, 1953 with chronic empyema, and on March 24, 1953 was transferred by ambulance to the Wesley Hospital in Oklahoma City; that he thereafter and at 5:30 P.M., March 24, 1953, was admitted to the Wesley Hospital in Oklahoma City; that on his admission into the Wesley Hospital he was having chills, was acutely ill; blood pressure 190/90, pulse 132; respiration 20; skin, hot and dry; sensorium, appeared slightly cloudy; that on 3–26–53 he became irresponsive rather suddenly, 15 minutes after receiving 100 milligrams of Demerol; that on March 28, 1953, he was operated a third time, no abscess was found; much edema in the pleural tissues. Following this operation, there was considerable distention of the stomach. That on April 7, 1953 the fourth operation was performed, a transverse colostomy, and a large carcinoma was found. That on April 9, 1953, he received the following sedatives: 7:30 P.M., luminal, 2 grains. 9 P.M. 100 milligrams of Demerol. 12 Midnight, luminal, 2 grains. April 10, 1953, 1:30 A.M., Demerol, 100 milligrams. 4:40 A.M. Demerol, 75 milligrams. That his temperature as 8:15 A.M. on April 10, 1953, was rectally, 103, and at 2:30 P.M. 103.4, rectally. That an attorney was called at some time after 9:30 A.M. on April 10, 1953, and discussed the preparation of a will with the patient; and that thereafter, and at about 4 P.M. on April 10, 1953, the patient was elevated in his bed, and with the assistance of the attorney holding his hand, executed a purported will whereby the patient disinherited his only two sons who had worked on the farm and helped him to accumulate his property, and thereby, attempted to leave his estate, one-half to his second wife, whom he had married in 1947, and the remaining one-half to the grandchildren of the patient's wife. Now, Doctor, assuming these facts to be true, do you have an opinion, based upon reasonably certainty, and from a medical point of view, as to whether the patient at the time of the execution of the above described instrument, or will, at approximately 4 P.M. on April 10, 1953, possessed the mental ability to know the nature and extent of his property, and to know and keep in mind the objects of his bounty

and persons who would have a right to expect to receive his property on his death, and to know and understand that he was executing an instrument making disposition of his property, now, do you have an opinion?

\* \* \* \* \* \*

"A. Yes, I have.

"Q. What is that opinion, Doctor?

\* \* \* \* \* \*

"A. May I have this chart, please?

"Q. Oh, yes, sure. A. In other words, I was just merely checking to see if you had overlooked more medications. This (indicating on chart) is a prescription that he was given in the muscle—I don't know what it was in addition to the other there. I will answer your question to the other there. I will answer your question by saying that I don't think he was mentally competent.

\* \* \* \* \* \*

"Q. Now Doctor, in making your answer, have you had the benefit of examination of Contestants' Exhibits 1, 1–A, 2–A and 3–A? A. Yes, sir, I have.

"Q. Do those exhibits to which I have referred, support the opinion which you have expressed as to the patient's mental condition? A. Well, especially, the one that was the last exhibit mentioned, showing the patient's definite mental and physical condition, and the rather large doses of sedatives that were given just the day before and on the day that he made the will; those, to me, are of most importance.

"Q. But you have had the benefit of all these exhibits which I have just mentioned. A. Yes, sir."

Dr. Haugen, eminently qualified surgeon with specialty in urology, testified for contestants to the effect that he had seen the deceased in consultation, while deceased was in the hospital at Ada and based upon all the hospital records and including the doctor's progress reports, and considering the huge amount of sedation given the deceased on the night of April 9th and morning of April 10th deceased was incompetent to make a will on April 10th, 1953. This doctor further testified that " * * * a patient who had had that much sedation, one would expect his mentality would be blurred for some time * * * 12 to 24 hours * * *. A patient who had been ill and undergone this much surgery and had so much sedation, it doesn't seem reasonable that he could transact business of this type."

At 11:00 A.M., April 10, 1953, the day of the execution of the will, an electro-cardiogram was taken and it was found that the testator had a partial heart block.

The attending physician, Dr. D., had testified that the first time the making of a will was mentioned was at 9:30 A.M. on April 10, 1953. However the registered nurse, looking after testator, on cross-examination stated that in a discussion with other witnesses at 7:00 A.M. on April 10, 1953, stated "This is the day Mr. Groves is going to make his will." Therefore the matter of making a will had undoubtedly been discussed on the day before. This nurse on this point testified as follows:

"Q. Ma'am, who was it you had the conversation with when you went on duty that morning, about 'this is the day Mr. Groves is to make his Will'? A. Well, we all gathered around the desk for our report.

"Q. What time did you go to work on the 10th day of April, 1953? A. I started at 7:00.

"Q. Seven O'clock. Had the matter of the making of the Will been discussed the day before? A. I said I don't remember how I found out it was going to be done, but I remember saying that morning, 'Well, this is the day Mr. Groves is going to make his Will'.

"Q. Well, you would have had to have gotten that information the day before, wouldn't you, ma'am? A. I guess.

"Q. If you came on Duty at 7:00 o'clock in the morning? A. I said I

don't remember how I got the information.

"Q. Was it generally discussed on the floor that Mr. Groves was to make a Will that day? A. That day?

"Q. Yes. A. Of course, we would have to know because I work there.

"Q. Yes, Ma'am, but what I was trying to get at is how did you get the information at 7:00 o'clock in the morning that was the day on which he was to make a Will? A. Well, the doctor—I understood he had already talked to the patient and advised him to—if things weren't in order for him to get them in order because it would probably be his last illness.

"Q. Who was his doctor, please, ma'am? A. Dr. Dunn."

Considering the entire picture of the events leading up to the time of the execution of the will, I am of the opinion that there is substantial evidence to support the findings and judgment of the trial court and that the judgment is not clearly against the weight of the evidence. I am of the opinion that the judgment of the trial court should be affirmed.

I therefore respectfully dissent.